Milligan, J.,
delivered the opinion of the court:
Henry S. Bulkley, who sues for the ase of Henry L. Ne.wman,. instituted this suit to recover the sum of $20,570, alleged to be due him on a written contract with the defendants, to transport Government stores across the western plains to Salt Lake City.
The facts on which the case rests are found by the court to ■ be as follows:
1. On the 21st of March, 1865, Henry S. Bulkley entered into a contract with Colonel J. F. Potter, quartermaster, United States Army, on the authority and by direction of the Secretary of War, to transport Government stores from. Fort Leavenworth, Kansas, to Salt Lake City, Utah Territory.
2. By the first article of the contract, Henry S. Bulkley, the *193 nominal claimant, bound himself to receive at any time, in any of the months from April to September, inclusive, during the year 1863, from the officers of the Quartermaster’s Department at Fort Leavenworth, and other points therein mentioned, all such military stores and supplies as may be offered or turned over to him for transportation in good order and condition, by the officer or agent of the Quartermaster’s Department at any or all of the above points or places, and transport the same with all practicable dispatch, and deliver them in like good order and condition to the officer or agent of the Quartermaster’s Department on duty at the post to which such stores shall be consigned.
3. Article IX of the contract provides :
“ That in case any one or more of the trains of the said Henry S. Bulkley are stopped or delayed at any time or place exceeding two days, either under the orders of an officer of the Quartermaster’s Department, or the commanding officer of a post, or of troops present, or by any other act on the part of the G-overnment or its agents, the contractor shall be paid upon a statement, in writing, procured from the officer or agent of the Government causing the delay, the sum of $5 per diem for each and every team in the train for each and every day they may be so delayed; and in case the officer or agent of the Government aforesaid shall refuse to furnish such statement in writing, then the delay shall be paid for, as above, on the affidavits or other satisfactory evidence of credible and competent witnesses. All orders from officers or agents of the Government to halt trains shall be given to the contractor or his agents, in writing, expressing fully the reasons therefor.”
4. Under this contract, which is drawn out in the regular and usual form, the nominal claimant, Henry S. Bulkley, employed Henry L. Newman, the real claimant, as sub-contractor, who thereby became subject to all the obligations of the original contract and entitled to all its benefits.
5. A train of twenty-two wagons, under the sub-contract, was loaded with military stores at Fort Leavenworth, Kansas, and consigned to Salt Lake City, Utah Territory; and after having been duly instructed, as provided in the contract, started for its destination on or about the 27th of July, 1865, and reached Fort Halleck, Dakota Territory, on the 18th of October following.
*194 Two wagon-masters, a principal and an assistant, were attached to the train. It was also accompanied by Ezekiel]; S. Newman, the brother of the claimant, who is shown to have exercised control over it in common with the wagon-masters.
6. The train traveled alone until it reached within about one hundred miles of Fort Halleck, where it fell in with four other trains, and continued with them to Cooper’s Creek, thirty-five or forty miles .east of the fort.
7. At Cooper’s Creek all five of the trains were delayed some three or four days by a severe snow-storm, and there E. S. Newman left the train, and took the overland stage-coach and reached Fort Halleck several days in advance of the train. On his arrival at the fort he applied to Major Darling, commanding the post, and Captain S. B. Bean, acting assistant quartermaster, for leave to stop the Newman train at the post until spring. He had with him the bill of lading, and spoke of it as his train, and appeared to have sole control over it, although there is no legal evidence showing he had any direct pecuniary interest in it.
8. The officers in charge of the post treated him as acting for the train, and, at first, manifested an unwillingness to allow it to halt, because the stores were needed at Camp Douglas, and there was no room to shelter them at Fort Halleck. In this state of the case, Major Darling proposed, as the best he could do, to take off a portion of the freight and let the train go on to Camp Douglas with the balance. This proposition was declined by E. S. Newman, because of the lateness of the season and the condition of the cattle.
A few days after the train arrived at Fort Halleck, Major Darling and Captain Bean inspected the goods and the cattle. The oxen were lean, jaded, and some of them lame. The roads were bad and the season inclement. In this posture of affairs the officers in charge gave consent for the train to stop over until spring, on condition the freighters would build storehouses for the goods at their own expense, which they did.
9. The train reached Fort Halleck, as before shown, on the 18th of July, 1865, and after it was decided that it should remain over until spring, Mr. Tate, the claimant’s principal wagon-master, dispatched to H. L. Newman that his train had been stopped at Fort Halleck by order of S. B. Bean, quartermaster. To which Newman replied, 11 to get the order of Cap *195 tain Bean indorsed on the bill of lading, and, if not, to proceed to Salt Lake.”
Thé reply of the claimant was returned, addressed to his brother, E. S. Newman, who, with the wagon-master, Tate, applied to Captain Bean for the required indorsement, which was entered, as follows:
“ OFFICE ASSISTANT QUARTEEMASTBE,
“ Fort Halleek., I). T., October 25,1865.
u The within train arrived at Fort Halleek, Dakota Territory, October 18, 1865. In consequence of the bad condition of the transportation and the lateness of the season, I judge it unsafe and detrimental to the interest of the Government for the train to proceed further this season, and order the property stored here till spring, or such time as it may be safely forwarded.
“ The property all arrived apparently in good order and condition, with the exception of a deficiency of (16) sixteen sacks of flour, and was stored in buildings erected by the men of the train, there being no sufficient store-houses at the post.
“ S. B. BEAN,
“ Captain and A. Q. If., United States Volunteers.”
10. Under this state of facts the goods remained at Fort Halleek until the 23d of April, 1866, when they were ordered forward by Captain Laycock, Captain Bean’s successor, and arrived safely at Salt Lake City the 25th of June following.
The case presented on the foregoing facts for decision mainly rests on the ninth article of the contract, and Quartermaster Bean’s action under it. On the part of the claimant it is contended that the order of Captain Bean so incorporates itself into the written contract that it cannot be contradicted or varied by external evidence; and on the part of the defendants it is insisted that it is capable of explanation by parol testimony, and when so explained, it is but a permission to do what the claimant desired to do, and therefore not within the meaning of the ninth article of the contract.
1. On the former hypothesis, the claimant’s attorney objects to the testimony offered in explanation of the circumstances under which the order was procured ; and the first point for formal decision is as to the admissibility of this testimony.
It is obvious that the quartermaster’s order is*a mere memorandum of what he did in the premises. It is wholly collateral *196 to the contract itself, and constitutes no part of it. The action is not founded on it, and it can be used for no other purpose than as a matter of evidence, which could have been supplied,, had the order never been written, as well by the testimony of competent witnesses.
It is clear, therefore, the testimony is not excluded because the order constitutes a part of the contract; nor do we think it is such a writing as excludes oral testimony in explanation of the circumstances under which it was given. There are three principal classes of cases in which it is laid down in the elementary books that writings exclude oral testimony. First, instruments which the law requires to be in writing; second, written evidence of a contract which the parties have put in writing; and, third, oral evidence cannot be substituted for any writing the existence of which is disputed, and which is material to the issue between the parties, or to the credit of witnesses, and is not merely the memorandum of some other fact. “ But,” says Greenleaf, in his Evidence, vol. 1, § 90, “ when the writing does not fall within- either of the three classes already described, there is no ground for excluding oral evidence. As, for example, if a written communication be accompanied by a verbal one to the same effect, the latter may be received as independent evidence, though not to contradict the writing, or as a substitute for it.”
The facts of this case fall directly within the principle above stated, and the testimony is therefore clearly admissible as in-depen dept testimony.
2. This preliminary question out of the way, we come to consider the claimant’s fight to recover under the contract. The claim is made on the ninth article, which we have seen provides for compensation to the contractor in the event any of his trains shall be stopped or delayed for more than two days at any time or place, either under the orders of an officer of the Quartermaster’s Department, or the commanding officer of the post, or of troops present, or by any other act on the part of the Government or its agents.
Looking to the wilderness country through which the stores were to be transported, and the uncertain movements of the Indian tribes ^tkat inhabited it, this provision in the contract was not only just and liberal to the contractor, but a fair and reasonable protection to the Government. It recognizes the *197 ■right in. the officers or agents of the Government to delay the trains at any time or place on the route, when, in their judgment, the freight would be endangered or exposed to loss by continuing the progress of the transportation. And, on the other hand, when any such train is delayed without default of the contractor, it provides for a just compensation for each day’s delay.
But it would be absurd, as well as in conflict with the first article of the contract, which obligates the freighter to transport the stores “with all practicable dispatch,” to hold that a •delay caused by the contractor, or through any defect or accident in his means of transportation, would entitle him to recover the compensation provided for in the ninth article of the contract. The Government certainly did not intend to assume any such obligation, and the ninth article will not justify any ■such interpretation. The risk incident to the transportation belonged' to the contractor, and this clause in the contract was not inserted to relieve him from any such .responsibilities, but to enable the Government to protect the stores from loss or exposure to extraordinary danger while in trcmsitu.
Under this view of the contract, the remaining question is purely a question of fact. Was Captain Bean’s order given for the protection of the stores unmixed with default on the part of the claimant, or at his request, and for his benefit % The reasons assigned in the order, which are corroborated by the external evidence, leave no doubt on the mind of the court that none of the causes contemplated by the ninth article for which he would have been justified in delaying the train were present and moving the quartermaster to stop it. He says he gave the order “ in consequence of the bad condition of the transportation and the lateness of the season.” The train left Fort Leavenworth within the time the contractor bound himself to receive .and transport the defendants’ stores to any point on his route to which they might be consigned, and surely, after it was inspected, the Government cannot be held responsible for snbseqnent defects in the transportation.
Couple the intrinsic facts shown on the face of the order with the independent parol evidence, which shows the desire of the -officer in charge of the post to push through the train, or at least a portion of the stores,- to Camp Douglas, where they ■were needed, and the utter inability of the train to proceed *198 with safety further than Fort Halleck, and it is clear the delay on which the recovery is sought was due to the defects in the claimant’s transportation, and therefore permitted by the quartermaster at his solicitation and for his benefit.
But it is objected that E. S. Newman, who negotiated for the delay of the train, had no authority to act for his brother. This objection cannot be sustained. It is true there is no direct evidence establishing his agency, but it is fully implied from the facts and circumstances of the case. He is shown to have traveled with the train from Fort Leavenworth to Cooper’s Creek, when he left it and went forward and began negotiating for its delay at Fort Halleck. He there not only held himself out to the officers in charge of the post as controlling the train, but as its owner, and exhibited the bill of lading as the evidence of his authority to act for it. The officers treated him as having full power to act for the train, and proposed to lighten its burden if he would proceed with the remainder to Camp Douglas, which he promptly declined, because it was impossible for the train safely to go further forward.
Added to these facts, which are sufficient to imply his agency,, it cannot be overlooked that the claimant, after he had been notified by the principal wagon-master that the train had been; stopped, replied by telegram addressed to his brother, E. S. Newman, to get the quartermaster’s order halting the train indorsed on the bill of lading, or to proceed to Salt Lake. This request was complied with by the brother, and the order presented in the findings obtained, after it had been stopped at the request of the claimant’s lawful agent, and when it fully appears it had no power to proceed further that season.
Entertaining these views of the case, the court directs the-petition to be dismissed.